Pette, J.
This is a motion to vacate the award in arbitration, dated October 28, 1955, in favor of the respondents, comprising a partnership doing business as Florida Molasses Company, in the sum of $82,752.79 without interest.
Petitioner claims that the arbitrators made obvious mistakes in calculations when determining the damages sustained by respondents, or they were guilty of partiality toward them in connection with the foregoing. Petitioner also contends that the arbitrators exceeded their powers and that the award made by them is invalid because one of the respondent partners, Joseph A. Lopez, Jr., died after the submission, but prior to the award, and no steps were taken to join his executor, administrator or temporary administrator.
The respondents contend that there is no merit to the foregoing contentions; that the arbitration herein is solely within the jurisdiction of a Court of Admiralty and in any event, that this application is premature because of the pendency before the arbitrators of an application by the petitioner for the reconsideration of alleged errors in the award concerning the amount of molasses lost through petitioner’s fault.
The arbitration was held in accordance with the provisions of an arbitration agreement, contained in a charter party, between the petitioner and the respondents, which provided for the transportation of a cargo of black strap molasses from several ports in Puerto Rico to Jacksonville, Florida. The arbitration agreement, in part, provided as follows: ‘‘ Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York pursuant to the laws relating to arbitration there in force * * * In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above mentioned for the appointment of a third arbitrator ”. (Emphasis supplied.) Because of the language emphasized above for the appointment of a third arbitrator if the two designated by the *228 parties failed to do so, the respondents contend that only the District Court of the United States for the district wherein the arbitration was held has jurisdiction.
It is clear, however, that by virtue of the saving to suitors clause contained in section 1333 of title 28 of the United States Code, that this court has concurrent jurisdiction with the United States courts in arbitration proceedings, notwithstanding that they arise out of so-called maritime contracts. Mr. Justice Brandeis observed in Red Gross Line v. Atlantic Fruit Co. (264 U. S. 109, 123): “ By reason of the saving clause, state courts have jurisdiction in personam, concurrent with the admiralty courts, of all causes of action maritime in their nature arising under charter parties ”. (See, also, Madruga v. Superior Court, 346 U. S. 556, 561.)
In addition, the opening sentence in the arbitration clause — “Any and all differences and disputes * * * arising * * * shall be put to arbitration in the City of New York pursuant to the laws relating to arbitration there in force ’ ’ — shows that the parties intended that the arbitration of any disputes arising out of the charter party should be subject to the New York State arbitration statute.
As for the respondents’ claim that this application is premature, it is clear that the comprehensive 25-page written award, concurred in by the three arbitrators and signed by them on October 28, 1955 was the final award within the meaning of section 1460 of the Civil Practice Act. The efficacy of this award is not affected by the subsequent correspondence from the respective attorneys to the arbitrator designated by the two whom the parties had chosen and by that arbitrator’s statement to one of the attorneys for the respondents that the arbitrators were willing to consider counsel’s contentions. It should be noted, moreover, that one seeking to vacate, modify or correct an award in arbitration must do so by timely motion, as provided by section 1463 of the Civil Practice Act — within three months after the award is filed or delivered. Therefore, it would have been improvident, to say the least, for the petitioner to have delayed its motion beyond the three-month period.
As for petitioner’s claim that the death of one of the respondent partners subsequent to the submission, but before the award, constituted a revocation and termination of the arbitration proceedings, the court is of the opinion that it is without merit. True, section 1468 of the Civil Practice Act provides that proceedings may be begun or continued subsequent to the death of a party to a submission or a contract upon the application *229 of, or upon notice to, his legal representative, and that ordinarily the death of a party to an action or proceeding results in a suspension of all activity therein until a substitution is made for the deceased party. (Reilly v. Hart, 130 N. Y. 625, 628; Angelo v. Angelo, 282 App. Div. 981.) Here, however, the deceased was one of six partners of the respondent Florida Molasses Company and the New York arbitration statute makes no provision for any change of parties where, as here, one side to the arbitral dispute is a partnership, one of whose partners died after the hearings were concluded and the dispute submitted for decision by the arbitrators. As stated in CarmodyWait Cyclopedia of New York Practice (Vol. 2, § 16, p. 82): “ Where, on the death of one of several coplaintiffs or codefendants, the whole right of action or ground of relief survives in favor of or against the other plaintiffs or defendants, it is not necessary to bring in the representative or successor in interest of the deceased party in order to continue a pending action; for the whole cause of action in such case has vested in the survivors. Such is the case of the death of one or two or more executors, trustees, or joint tenants during the pendency of a suit by or against them. Likewise, where two partners sue on a partnership debt, since each partner alone fully owns and represents the cause of action, if one partner dies, the surviving partner may proceed with the action. And in an action against two copartners where the liability is joint or joint and several, if one of the defendants dies pending the action, the plaintiff may proceed against the surviving defendant.” Furthermore, the award under these circumstances may be deemed to have been made nunc pro tunc as of the time of the original submission of the controversy for decision by the arbitrators, notwithstanding the subsequent death of one of the six respondent partners. (Angelo v. Angelo, 283 App. Div. 588 and the authorities cited, p. 590.)
The award here involved was made on a claim by the respondents of a shortage of Puerto Pican black strap molasses, and other items of damage caused by petitioner, as carrier, in the process of discharging the cargo from its tankship S.S. George Ogden at respondents’ plant in Jacksonville, Florida, in May, 1948. The vessel’s total tank capacity was 1,900,000 gallons, but she loaded a total of 1,779,289 gallons. Enroute the cargo was heated by means of steam pipes in the tanks so that when the ship arrived at Jacksonville on May 7, 1948 the cargo was 110 degrees Fahrenheit in each of the tanks or a few degrees below that. The unloading commenced immediately by means *230 of the ship’s pumps through respondents’ underground eight-inch suction line into their new main shore tank with a capacity of 1,762,308 gallons. Respondents had 2 smaller tanks, each with a capacity of 16,000 gallons, or a total capacity of 1,794,308 gallons. There were also available 14 tank cars with a total capacity of 110,000 gallons, thus making a total shore capacity of 1,904,308 gallons for the receipt of the cargo of 1,779,289 gallons, or an excess capacity of 125,019 gallons, or 7%.
As the pumping was nearing completion on May 10, 1948, a loud rumbling of air in the pipeline and the shore tank was observed. The ship was pumping too much air with the cargo, causing an excessive amount of foam. This continued to the point in respondents’ main tank when the tankometer showed 25 feet of molasses and 5 feet of foam, the latter extending up to the roof of the tank. At this point respondents’ representatives ordered the vessel to stop discharging its cargo. The foam started to come down the outside of the tank within an hour after the discharge stopped, escaping through the manhole and the two vents and respondents’ representatives remained at the scene until 2:00 a.m. of May 11, during which time they unsuccessfully tried to sell the molasses remaining in the vessel and to obtain tank barges.
Since the respondents had already used all available shore capacity, including the 2 smaller shore tanks and all available tank cars, and could not then handle more cargo, they arranged with the master of the ship to carry the molasses remaining in its tanks out to sea to dump it, and paid the vessel owner’s agents $1,920, the amount of one day’s hire.
The vessel sailed at 7:45 p.m. on May 11. Respondents’ representative succeeded on the following day in chartering a tank barge from Florida Towing Corporation and pumped 100,000 gallons of the molasses from the main shore tank into that barge. As the foaming and overflow continued, they chartered a second tank barge from Diesel Corporation on May 15, and pumped 120,000 gallons from the main shore tank into that barge. On May 17 portable steam boilers were obtained to reduce the foam by spraying steam into it off and on for 10 days. Sprinkers were also placed on the roof of the tank for 48 hours. It was testified that the molasses became quiet about 35 days after the ship left, and that the expansion from the air and the heating had been so great that the roof plates of the main shore tank were permanently put out of shape.
The arbitrators concluded that the sole cause of the respondents’ loss was the petitioner’s negligent discharge of the cargo, for which it was liable to the respondents. They stated on page *231 23 of their award that the items of damage claimed by the respondents were as follows:
“ Shortage — 331,041 gals, at 25.7 cents per gal. $85,078.54
Demurrage paid to George Ogden’s owner 1,920.00
Labor — cleaning dock 302.00
Municipal Docks, bill for installing drain 123.35
Barge rental (two barges) 3,060.00
Pumping molasses to and from barges and steaming tank 1,058.65
Drainage pipe at Municipal Docks 390.00
Temperature reading by Southern Analytical Laboratory 15.00
$91,947.54 ”
and that ‘‘ The amount of the shortage is the difference between the quantity of molasses loaded on the George Ogden and the amount actually left in the possession of Florida after some of the original cargo had been lost in the overflowing of the main shore tank and some carried off in the George Ogden to be dumped at sea.”
The arbitrators held that while the respondents could not be charged with negligence for not anticipating the sudden and unusual and unforeseen occurrence above described, nor in not having a greater margin of available shore space for this cargo, they were not sufficiently alert in minimizing their loss. Since it was impossible to determine what saving could have been made by the respondents by minimizing some of the shortage, the arbitrators concluded that there should be a deduction of 10% from their proved damages. This amounted to $9,194.75, which, when deducted from the total items of damage claimed by the respondents — $91,947.54 — resulted in a balance of $82,752.79, which was awarded to them without interest.
Petitioner has submitted no credible proof that the arbitrators or any of them were ‘‘ guilty of partiality toward the respondent Florida Molasses Company in making an award to the latter.” A different situation, however, is presented by petitioner’s claim that the quantity of molasses the arbitrators found to have been lost to the respondents was more than any evidence before them could sustain. While recognizing the limited judicial role in arbitration (Matter of Spectrum Fabrics Corp. [Main St. Fashions], 285 App. Div. 710, 714-715, affd. 309 N. Y. 709), petitioner contends that this court has power to vacate the award because by refer *232 ence thereto and undisputed excerpts from the testimony the arbitrators adopted the quantity of molasses which the respondents in their brief erroneously claimed was lost through petitioner’s fault; and that as a result the amount of molasses the arbitrators found could have been lost was approximately twice as much as any evidence before them could sustain had they made the calculations in accordance with their own statement in the award as to the method they adopted for determining the shortage.
It is not easy in a case such as this to draw the line between errors of law or fact and the miscalculation of figures. As to the former, the award is unassailable no matter how disappointing it may be to the parties. (Matter of Wilkins, 169 N. Y. 494, 496-497.) As to miscalculation, it was noted by the Supreme Court of Vermont in Vanderwerker v. Vermont Central R. R. Co. (27 Vt. 130, 137): “ The mistake must be one which shows that the arbitrator was misled, deluded and so far misapprehended the case, that he failed to exercise his real judgment upon it. The most familiar illustration is a mistake in computation. The use of a false measure, or a false weight is similar. ’ ’
In Fudickar v. Guardian Mut. Life Ins. Co. (62 N. Y. 392, 400), our Court of Appeals stated: “ The general principle is subject to the qualification that awards may be set aside for palpable error of fact, like a miscalculation of figures, or mistake of that nature.” While such a mistake must appear upon the face of the award it need not appear therein by express statement. It is sufficient if it be shown by clear and necessary inference (p. 401).
It is not denied that the respondents’ brief before the arbitrators stated: “ The inventory of sales indicated that there had been delivered 1,448,882 gallons out of the shipment of 1,779,923 gallons or a loss of 331,041 gallons.” Since it is obvious from the award that it is this 331,041 gallons that the arbitrators found constituted the difference between the quantity of molasses loaded on the S.S. George Ogden and the amount actually left in the possession of the respondents, and the arbitrators found at the same time that the total amount loaded was 1,779,289 [and not 1,779,923 gallons], a palpable error in computation is immediately evident; when 1,448,882 gallons, claimed by respondents to have been delivered, are subtracted from the 1,779,289 gallons found to have been originally loaded aboard ship, the shortage upon which the award rests is reduced by 634 gallons.
*233 Another error in computation is evident in the figure of 1,448,882 gallons claimed in respondents’ said brief as having-been delivered when the total testified to as having been sold by the respondents was 1,449,882 gallons, or a difference of 1,000 gallons. It is not denied that Heiser, the manager for the respondents, testified that between May, 1948 and May, 1949 the following monthly sales of molasses from the cargo involved were made:
May, 1948 47,500
June 56,200
July 87,282
August 87,600
September 99,100
October 111,250
November 107,200
December 130.320
January, 1949 174,280
February 134,850
March 171,400
April 147,000
May 95,900
or a total of 1,449,882
Petitioner moreover claims that on the basis of testimony adduced by the respondents themselves 1,610,590 gallons of molasses were actually delivered to their shore tank storage facilities and not merely the amount claimed to have been sold in the course of about a year.
At pages 9-10 of the award the arbitrators found that the respondents’ main shore tank, 30 feet high, had a capacity of 1,762,308 gallons; that their 2 smaller tanks had a total capacity of 32,000 gallons and that their 14 tank cars a total capacity of 110,000 gallons, or a total overall shore capacity of 1,904,308 gallons. At page 16 of the award they noted that by 7:00 a.m. on May 11 the respondents " had already used all available shore capacity including the two smaller shore tanks and all available tank cars, and could not then handle any more cargo.” Since the arbitrators found at page 13 of their award that the tankometer on the main shore tank showed 25 feet of molasses and 5 feet of foam, the latter extending up to the roof of the tank, that tank must have contained 1,468,590 gallons when its tankometer registered 25 feet of solid molasses out of the full height of 30 feet. When the full capacity of the 2 smaller tanks and the 14 tank cars, totalling 142,000 gallons, is added to the 1,468,590 gallons in the main tank, the total of molasses received *234 by the respondents amounts to 1,610,590 gallons. It is this figure which the petitioner claims should be substracted from the 1,779,289 gallons which the arbitrators found were originally loaded aboard ship, leaving a balance remaining of 168,699 gallons, which was subsequently dumped at sea, rather than the 331,041 gallons claimed by the respondents and found by the arbitrators to have been lost through the petitioner’s fault.
All of the foregoing indicates that the amount of damages awarded by the arbitrators was more than they themselves intended and that the amount of the award would have been different, but for the miscalculations. (Fudickar v. Guardian Mut. Life Ins. Co., 62 N. Y. 392, 400, supra.) The court is, therefore, constrained to vacate and annul the present award, not only under the provisions of the statute, but in the interests of justice as well. (Cf. Matter of Rosenberg [Wolfe], 180 Misc. 500, 503, 504.)
Inasmuch as this court is satisfied that the indicated errors were unintentional and not culpable, the proceeding is remitted to the same arbitrators for the purpose of reconsidering the amount of damages in light of the testimony already before them, supplemented by such other relevant and material proof as they may require or as may properly be tendered by the respective parties. It would appear, as disclosed in the opposing affidavit, that the arbitrators themselves have indicated willingness to consider alleged errors in the award, which were brought to their attention in petitioner’s counsel’s correspondence with them, subsequent to the filing of the award.
Proceed on notice.